**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Michael C. Dillon</u>

   **v.**                                                    Case No. 11-cv-328-PB
                                      Opinion No. 2012 DNH 179
<u>Michael J. Astrue, Commissioner</u>
<u>Social Security Administration</u>

**MEMORANDUM AND ORDER**

Michael Dillon seeks judicial review of a decision by the
Commissioner of the Social Security Administration denying his
applications for disability insurance and Supplemental Security
Income benefits.  He argues that I should either reverse the
Commissioner's decision or remand the case for further
proceedings because the Administrative Law Judge ("ALJ") erred
in weighing the medical evidence and concluding that Dillon was
not disabled.  For the reasons provided below, I deny Dillon's
request.

**I.   <u>BACKGROUND</u>**[1]

Dillon applied for disability insurance and supplemental
security income benefits on April 22, 2009.  He alleged a
disability onset date of June 1, 2003, due to post traumatic

---

[1] The background information is taken from the parties' Joint
Statement of Material Facts.  Citations to the Administrative
Transcript are indicated by "Tr."

stress disorder, anxiety, depression, osteoarthritis, stomach problems, and asthma.  Tr. 11.  Dillon completed high school and two years of college.  He then earned a certificate from a sound recording school and worked as a stage technician between 1989 and 2003.  Tr. 36.  Dillon also worked for about six weeks at a gourmet pet treat company in 2003.

## A.   **Procedural History**

The Social Security Administration denied Dillon's application for benefits on September 29, 2009.  Following denial, he requested a hearing before an ALJ, which occurred on January 11, 2011.  Dillon was represented by counsel and testified at the hearing.  The ALJ issued an unfavorable decision on January 28, 2011.  Dillon appealed to the Decision Review Board, which affirmed the ALJ's decision on May 2, 2011.

## B.   **Relevant Medical Evidence**[2]

### 1.   Treatment Summary, November 2004 – October 2006

Dillon first sought psychological treatment on November 22, 2004, at Bedford Counseling Associates.  He complained of anxiety and depression, which began when his mortgage company attempted to foreclose on his home.  He feared leaving his house

---

[2] Because Dillon only challenges the ALJ's assessment of his mental impairments, I need not address his physical work capacity.  See Brun v. Shalala, No. 93-320-B, 1994 WL 504305, *1 n.3 (D.N.H. July 29, 1994) (citing Alan Corp. V. Int'l Surplus Lines, Inc., 22 F.3d 339, 343 n.4 (1st Cir. 1994)).

and was anxious that he was being recorded.  He claimed that anxiety and depression had prevented him from working since 2002.  At the time, he was not interested in a psychiatric evaluation to determine his need for antidepressants.

On January 10, 2005, he reported struggling with loss of motivation, low energy, and low self-esteem, but felt less pressure regarding his legal problems.  On February 7, 2005, he told his counselor that he was still uninterested in taking antidepressants.  Dr. Elizabeth Blencowe assessed Dillon's global functioning at 55, which indicates moderate symptoms or moderate difficulty in social or occupational functioning.  On March 7, 2005, he became tearful at his counseling session and expressed feelings of helplessness and being overwhelmed.  He expressed some interest in psychiatric medication and agreed to a medical consultation to explore the possibility of medication. Tr. 221.  He underwent an evaluation later that month, but again refused antidepressants.  Id. at 224.  On March 24, 2005, Dillon expressed anger about the fees he was paying and refused to discuss his problems.

Dillon was transferred to a new counselor, Jessica Capuano, at the Mental Health Center of Greater Manchester on March 29, 2005.  Id. at 213.  At his meeting with Ms. Capuano on March 29, 2005, Dillon appeared fully oriented, cooperative, pleasant, coherent and logical upon examination, although he said that the

transfer had caused him stress.  He showed no sign of suicidal or homicidal ideation.  Ms. Capuano assessed his global functioning at 65, indicating that he had some mild symptoms or some difficulty in social, occupational, or school functioning, but was generally functioning well and had some meaningful personal relationships.

On April 6, 2005, Dillon said he expected his stress levels to increase because he faced another court appearance in May. He was counseled on strategies for dealing with stress.  He requested and received anger management training.  He expressed feelings of helplessness regarding his mortgage issues, but reported doing small jobs that kept him busy.  On April 13, Dillon said that his court date had been postponed and he was keeping busy by helping to plan his brother's wedding and helping his mother with yard work.  On April 20, he expressed feelings of helplessness, but said he was keeping busy with small jobs.  On May 24, he said he had an appointment to meet with Dr. Blencowe about possibly beginning medication.

On June 14, 2005, Ms. Capuano noted that Dillon presented as depressed and tearful.  He reported sleep problems and blurry thoughts.  Ms. Capuano noted that his mental state was apparently related to the legal proceedings involving his home, though he told her he felt optimistic about the upcoming verdict.  On June 20, he told Ms. Capuano that he planned to

start taking Zoloft again soon.  Tr. 196.  On July 18, 2005, he told Ms. Capuano that he had started taking Zoloft.  Id. at 192.

On August 8, 2005, Plaintiff reported feeling "stir crazy" due to idleness because his legal problems had ebbed.  Tr. 188. He was not sleeping well and had stopped using Zoloft.  Id.  On August 19, he reported increased anxiety and trouble sleeping because of the mortgage litigation.  Id. at 186.  On August 30, he felt less depressed because his litigation had ended.  Id. at 184.  He believed he would only need two more months of treatment and discussed decreasing the frequency of his sessions.  Id.  He reported having a positive, supportive relationship with his girlfriend of nine years, despite feeling generally antisocial.  The counselor noted that Dillon's mood was even and his depression was decreasing; he even joked during the session.  Dillon said he was sleeping well and not experiencing hallucinations.  Id.

On September 14, 2005, Dillon reported experiencing greater distress because the litigation process had begun again.  Id. at 182.  By September 27, 2005, he resumed taking Zoloft, and said that it made him feel like he was "swimming through mud."  Id. at 180.  He requested sleep medication.  Id.  The counselor reported his mood and affect as agitated.  Id.

On October 4, 2005, Dillon said his sleep medication helped him sleep but made him feel lethargic in the morning.  Id. at

178.  He could not discern the effects of taking Lexapro
(another antidepressant), but had increased his work on
"projects and jobs."  Id.  On October 25, 2005, Dillon told his
therapist that Lexapro was "leveling him off" and that his
ability to sleep continued to improve.  Id. at 176.  He said he
was functioning better and was performing odd jobs, such as
landscaping.  Dillon's therapist reported that his mood, affect,
and functioning were appropriate and normal.  She described his
thought processes as "future and goal oriented."  Id.  On
November 1, his therapist reported that he appeared less
anxious, smiled, and was more engaged in their conversation.
Id. at 164.  On November 17, Dillon said he felt less depressed,
though he was unsure whether his mood was due to medication or
the fact that stressors had declined.  Id. at 163.

     Dillon missed several subsequent therapy sessions and
stopped taking his medication.  Id. at 174.  He returned on
December 19, 2005, and told his therapist that he felt stressed
about the approaching holidays and his mother's illness.  His
mortgage litigation had resumed, and he said tearfully that he
did not like or trust people.  He said he was doing some odd
jobs for income.  On December 21, Dillon reported an increase in
stress because of his mother's illness, but said he was doing
"okay" and appeared less anxious, despite his continuing legal

problems.  There are no further medical records from The Mental Health Center of Greater Manchester.

Dillon next visited a physician on October 26, 2006 at the Hooksett Medical Center.  Tr. 245.  At the intake session, he reported difficulty sleeping during high stress times.  He reported a history of depression and anxiety.  The nurse noted that Dillon presented as appropriately dressed, pleasant, and able to carry on a conversation.

In his disability appeal, Dillon stated that he stopped seeking mental health treatment at The Mental Health Center of Greater Manchester after one year because he was no longer able to afford appointments once a one-year payment deferral ended. Tr. 145.

2.   Evaluations by Karin Huffer, M.A., Ph.D

Dillon met with Karin Huffer for approximately four hours in 2007.  She completed reports in 2007, 2009, and 2010.[3]  On December 19, 2007, Dr. Huffer completed a "Report and Request for Reasonable ADA Accommodations," which was apparently

[3] The record is unclear as to exactly when and how frequently Dr. Huffer met with Dillon.  Dr. Huffer's 2007 report is dated December 19, 2007.  Tr. 250.  Her 2009 report lists January 14, 2007, as "Date First Seen" and April 24, 2009 as "Date Last Seen."  Tr. 248.  She indicated in her 2010 report that the impairments she identified therein were first present in 2008. Id. at 323.  Dillon testified that they met only once in 2007 when Dr. Huffer was attending a conference in Albany, NY.  Id. 44.  Dillon indicated in an SSA report, however, that his first visit with Huffer was in the spring of 2007 and his last visit before the report was prepared was in March 2009.  Id. at 125.

prepared to support Dillon's request for accommodations in connection with his mortgage litigation.  In the 2007 report, Dr. Huffer stated that Dillon presented with "anxiety, depression, and traumatic stress" due to the "bureaucratic/legal quagmire" involving efforts to foreclose on his home.  Tr. 254. She wrote that he was "well oriented regarding time, place, and person.  He dresse[d] appropriately and present[ed] himself as a quiet person but with clarity and cooperation."  He expressed no suicidal or violent thoughts and "display[ed] at least an average level of intelligence."  She observed that he "is strong with tangible, factual matters."  She diagnosed him with PSTD and depression and stated that his global functioning before "injury" from legal abuse was 85-90 and after injury due to stress from legal system was 55-60.  Id.  Dr. Huffer did not describe the basis for her conclusions.

Dr. Huffer completed a mental impairment questionnaire on June 15, 2009 following a mental status exam.  She described Dillon's appearance as "slightly disheveled, fearful, anxious, depressed."  His speech was "slowed," and his mood was "agitated, hypervigilent."  His affect was "surrendered, fearful."  She reported that his thoughts were "clear but distorted by flashbacks, traumatic memory."  He had "poor concentration," "good orientation," and she found it "very difficult to trigger memories of his victimization."  She wrote

8

that he had "basic independence" in daily activities, was "very isolated" socially, could complete "simple chores," and characterized his stress reaction as "post traumatic stress disorder."  The only description she gave of the "Treatment Provided & Response to Treatment" was: "Protocols and attempted help with traumatic litigation."

On October 16, 2010, Dr. Huffer submitted a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" to the SSA.  She noted that Dillon was mildly restricted in his ability to understand, remember, and carry out simple instructions, and in his ability to make judgments on simple work-related decisions.  Tr. 322.  She noted a marked restriction in his ability to understand and remember complex instructions, carry out complex instructions, and make judgments about complex work-related decisions.  Id.  She described the "factors (e.g., the particular medical signs, laboratory findings, or other factors described above)" supporting her assessment as follows: "When Mr. Dillon is symptomatic his impairments are marked to extreme; the legal pressure triggers symptoms."  Id.  She provided no further details.

Dr. Huffer further reported that Dillon was markedly restricted in his ability to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to usual work situations and changes in a routine

work setting.  Id. at 323.  She listed the factors supporting her assessment as "when symptomatic" without further elaboration.  Id.  She stated that Dillon's impairments affect his "concentration, communication, energy," but did not describe how.  Id.  She described the factors supporting her assessment as "Post Traumatic Stress Disorder and protracted litigation following illegal foreclosure."  Id.  She stated that she first observed these limitations two years ago.  Id.

Dr. Huffer had a Master's degree in marriage and family therapy when she prepared the 2007 and 2009 reports.  Id. at 249, 250.  By 2010, when she submitted the Medical Source Statement, she had attained a Ph.D. in forensic psychology.  Id. at 321.

### 3.    Evaluation by Darlene R. Gustavson, Psy.D.

On July 16, 2009, Dr. Darlene Gustavson, Psy.D., conducted a consultative psychological evaluation of Dillon in connection with his application for social security benefits.  During her personal examination of Dillon, he complained of having poor short-term memory, difficulty concentrating, and difficulty trusting or interacting well with other people.  Tr. 290.  He said that his PTSD symptoms began in 2004 when his mortgage servicer attempted to illegally foreclose on his property.  He denied suicidal ideations.  He said that his depression began in 2003 and was constant for two to three years.  He described a

10

lack of motivation or energy, apathy, problems sleeping, minimal appetite, feelings of hopelessness, helplessness, and worthlessness, lack of interest in previously enjoyed activities, social isolation, and increased irritability.  Id. at 291.  He last worked regularly in 2006 and said he quit that job because he did not like his employer.  He started a handyman business in 2006, but closed it in 2008.  Id.  He told Dr. Gustavson that he had no current health insurance or health care providers.  Id.

In writing her report, Dr. Gustavson relied on her own examination of Dillon as well as Dr. Huffer's 2009 Mental Impairment Questionnaire; a June 2009 Adult Function Report; and progress notes by Bedford Counseling and The Mental Health Center of Greater Manchester from October 2004 to October 2005.  Tr. 292.  She observed the following: Dillon appeared well-groomed; he had normal speech and appropriate language comprehension; "Mood was bright.  Affect was labile.  He laughed and smiled at appropriate and inappropriate times during the interview."  Dr. Gustavson reported that his "[t]hought processes were logical and directed.  Thought content was normal. . . . Judgment and insight were intact."  After conducting a brief mental status examination using the Folstein Mini Mental Status Exam, she concluded that his intellectual

functioning was at least average and that he had no apparent memory or concentration problems.

Dillon told Dr. Gustavson that on a typical day, he wakes up around 9 or 10 am, "makes coffee, starts the computer, and checks email and the website he has created related to the legal issues, return[s] emails or phone calls, checks statistics online and prepares for court dates." Tr. 292. In addition, he completed chores around the house, cooked simple meals, attended any scheduled appointments, and went to bed between 1:00 and 3:00 a.m., though he had trouble falling asleep. She concluded that he requires no "assistance or direction to properly care for personal affairs, do shopping, cook, use public transportation, pay bills, maintain his residence, and care for grooming and hygiene." Id.

Dr. Gustavson concluded that Dillon is able to understand and remember instructions; interact appropriately and communicate effectively with family members, neighbors, friends, his landlord, and fellow employees; sustain attention and complete tasks; and tolerate stresses common to a work environment which includes the ability to make decisions, maintain attendance and schedule, and interact with supervisors. She recommended mental health treatment. Id. at 293.

4.   Evaluation by Michael Schneider, Psy.D.

On July 21, 2009, Dr. Schneider, a state agency psychologist who reviewed Dr. Gustavson's report and the other medical reports in the record, concluded that the evidence was insufficient to show a severe mental impairment either on June 1, 2003, the alleged date of onset, or September 30, 2007, the date last insured.  Tr. 307.  He indicated that Dillon had no limitations related to activities of daily living and had experienced no episodes of decompensation.  He concluded that Dillon was mildly limited in maintaining social functioning and maintaining concentration, persistence, or pace.  Id. at 305.

C.   **Hearing Testimony**

At the hearing on January 11, 2011, Dillon testified that he lives with his fiancée, who is disabled.  He was self-employed between 1989 and 2003 as a "freelance stagehand" in the Boston area.  Tr. 37.  His work involved setting up and taking down stages, including scenery and sound and lighting equipment. The job required unloading trucks, climbing ladders, climbing steel scaffolding, lifting heavy objects, and pushing heavy objects.  Dillon reported two problems with his back, including herniated discs in the lumbar region, and "general, basic arthritic conditions" in his knees.  Tr. 38.

Dillon testified that he began working for a gourmet pet treat company around 2003.  He made pet treats by hand, but

stopped working there after about six weeks because of "a difference of opinion with the owner of the company."  Tr. 39.

He stated that he experiences memory and short-term concentration problems:

> I'm constantly having to write notes to myself just to remind myself of things.  I get sidetracked easily.  In the middle of one task, I will suddenly start focusing on something completely different forgetting about what I was originally doing.  Focus is just absolutely horrendous and has been for [sic] awhile.

Dillon testified that he began receiving mental health treatment in 2004 because of "long-term litigation . . . [i]nvolving a fraudulent foreclosure."  He testified that he was suicidal at times and began crying at this point in the hearing.  See Pl.'s Br. (Doc. No. 8) at 8; Def.'s Br. (Doc. No. 13) at 9.  Around 2005, his fiancée convinced him to seek treatment at Manchester Mental Health.

Dillon testified that friends who were facing similar foreclosure defense issues connected him with Karin Huffer.  He met her in 2007 in Albany, New York, where she was attending a conference, and spoke with her for about four hours.  He also communicated with her via telephone and e-mail before and after that meeting.  Dillon testified that he was aware that she had diagnosed him with PTSD and depression.  When the judge asked how PTSD and depression impact his day-to-day life, Dillon said,

> I've essentially been stuck in a groundhog day episode for the last 10 years.  My life hasn't moved forward at all.

14

> Getting out of bed in the morning is enough of a task and
> then after that, it all depends on what the day brings.  It
> [PTSD and depression] certainly doesn't help with day-to-
> day activities at all.

Dillon testified that he starts his day around 8:00 am, and has

been operating a website related to foreclosure defense for

about four years.  He said that he checks e-mails from

homeowners, attorneys, the media, or others who contact him.  He

spends his day responding to these inquiries and stops anywhere

between midnight and 3:00 am.

Dillon said that he does not sleep well, never more than

six hours in a night.  He sometimes is awake for 24 hours.  In

the last few weeks, he had been "getting violent" during sleep,

including throwing punches, one time almost striking his fiancée

while she slept.  Tr. 45.

Dillon claimed that he does not get along very well with

other people.  He said he does not generally like or trust other

people and that he has "a tendency to get along better with

animals."  He testified that he has "a low tolerance for what I

perceive to be ignorance or stupidity," and he does not cope

well when he meets people he considers ignorant.  Dillon

testified that he was agoraphobic for a period of time, and

leaving the house to grocery shop was difficult for him.  He

feared that his mortgage servicer would either change the locks

on his house or possibly burn down the property.  He claimed

that there were documented examples of such things happening to other people.  He now does the grocery shopping for his household.  He and his fiancée both cook meals.

Dillon said that he was last in touch with Dr. Huffer about six or eight months prior to the hearing regarding litigation involving a car accident.  Tr. 46.  He has not received any medical care other than through the Mental Health Center of Greater Manchester and Dr. Huffer.  He testified that he took antidepressants in the past but was not taking any medication at the time of the hearing.

### D.   **ALJ's Decision**

The ALJ denied Dillon's application in a decision dated January 27, 2011, finding that the "claimant has not been under a disability within the meaning of the Social Security Act." Tr. 11.  After determining that Dillon had not engaged in substantial gainful activity since June 1, 2003, the alleged onset date of disability, he found that Dillon had a number of physical and mental impairments that were severe but did not reach listing level.  Id. at 15.

The ALJ gave significant weight to Dr. Gustavson's findings and opinion because Dr. Gustavson is experienced in evaluating disability claims, personally examined Dillon, prepared a thorough and detailed report based on that examination, and issued an opinion that is consistent with other medical evidence

in the record, including the opinion of Dr. Schneider.  Tr. at
25.  The ALJ gave Dr. Schneider's opinion only limited weight
because he indicated that Dillon's mental impairments are not
severe, a finding that conflicted with other record evidence,
and because he reported having insufficient evidence to render
an opinion regarding Dillon's mental RFC.  Id.

To the extent that Dr. Huffer provided contradictory
evidence, the ALJ declined to give it substantial weight for
several reasons.  Id.  First, her 2007 report related to
Dillon's petition to the United States District Court for
accommodations under the Americans with Disabilities Act and not
his functional capacity for work.  Id.  The standard to obtain
ADA accommodations is different from the standard governing the
SSA's determination of disability.  Id.  Second, the 2007 report
contains generalities about PTSD and Legal Abuse Syndrome that
Dr. Huffer did not specifically attribute to Dillon.  Id.
Third, the ALJ found that when Dr. Huffer wrote the 2007 and
2009 reports, she was not an "acceptable medical source."  Id.;
see 20 C.F.R. § 404.1513(a).  Additionally, Dr. Huffer failed to
state any objective medical signs, laboratory results, or other
factors supporting her conclusions.  Tr. at 24.  Finally, Dr.
Huffer's opinion contradicted those of Drs. Gustavson and
Schneider, which were more in accord with each other.  Id. at
25.  The ALJ did adopt Dr. Huffer's assessment that Dillon could

17

only perform work involving unskilled, simple decisions and
could be expected to understand, remember, and carry out simple
work-related tasks because that opinion was more consistent with
the findings of Drs. Gustavson and Schneider.  Id.

The ALJ found that although Dillon is unable to perform his
past relevant work as a stagehand, he has the residual
functional capacity to perform the full range of unskilled,
light work, involving understanding, remembering, and carrying
out simple work-related tasks.  The Decision Review Board
reviewed the case and affirmed the ALJ's decision on May 2,
2011.

## II.  <u>STANDARD OF REVIEW</u>

Under 42 U.S.C. § 405(g), I am authorized to review the
pleadings submitted by the parties and the transcript of the
administrative record and enter a judgment affirming, modifying,
or reversing the "final decision" of the Commissioner.  My
review is limited to determining whether the ALJ used "the
proper legal standards and found facts [based] upon the proper
quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d
652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference
as long as they are supported by substantial evidence.  Id.
Substantial evidence to support factual findings exists "'if a

reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Id. at 770.

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record.  Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  In the context of a claim for social security benefits, disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F .R. §§ 404.1505(a).  The applicant bears the

burden, through the first four steps, of proving that his
impairments preclude him from working.  Freeman v. Barnhart, 274
F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the ALJ
determines whether work that the claimant can do, despite his
impairments, exists in significant numbers in the national
economy and must produce substantial evidence to support that
finding.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.  ANALYSIS

Dillon moves to reverse or remand the ALJ's decision to
deny his disability claim on the ground that substantial
evidence does not support the ALJ's decision that Dillon's
mental impairments were not disabling.[4]  Dillon first argues that
the ALJ gave too little weight to Dr. Huffer's evaluations.  He
next argues that the ALJ erred in relying on Drs. Gustavson's
and Schneider's reports because they lacked access to Dr.

---

[4] Dillon did not challenge the ALJ's findings regarding his
physical impairments.  I decline to address the merits of a
claim that the plaintiff either fails to raise or raises in a
perfunctory manner.  See Bergeron v. Astrue, No. 11-cv-395, 2012
WL 2061700, at *1 n.2 (D.N.H June 7, 2012) (declining to review
the claimant's mental health treatment records and evaluations
because she only challenged the ALJ's physical RFC
determination); Brun v. Shalala, No. CIV. 93-320-B, 1994 WL
504305, at *1 n.3 (D.N.H. July 29, 1994) (declining to speculate
on the merits of an undeveloped claim) (citing Alan Corp. v.
Int'l Surplus Lines, Inc., 22 F.3d 339, 343 n.4) ("We have often
warned parties that issues raised in a perfunctory manner
unaccompanied by some effort at developed argumentation, may be
deemed waived.").

Huffer's 2010 report.  I disagree and conclude that substantial evidence supports the ALJ's findings.

## A.   The ALJ's Treatment of the Medical Evidence

When determining a claimant's eligibility for disability benefits, an ALJ must consider all medical opinions in the case record.  20 C.F.R. § 404.1527(b).  To the extent that there are conflicts of evidence, the agency, not the court, must resolve them.  Irlanda, 955 F.2d at 769.  Generally, if there is a treating physician, the ALJ must give his opinion controlling weight.  Leahy v. Raytheon Co., 315 F.3d 11, 20 (1st Cir. 2002). The agency will not consider a medical source to be a claimant's treating source, however, if the relationship is based solely on the claimant's need to obtain a report to support a disability claim.  42 USCA APP., 20 CFR § 404.1502.  Here, Dillon does not argue that Dr. Huffer was a treating physician, nor does the record support that conclusion.[5]

There are several reasons why the ALJ's decision to give limited weight to Dr. Huffer's opinions is supported by

---

[5] Dr. Huffer prepared an evaluation in 2007 in support of Dillon's request for ADA accommodations in his mortgage litigation.  She also provided reports in 2009 and 2010 specifically for his social security case.  She did not produce any treatment records or evidence of an ongoing treatment relationship with Dillon.  Because all three of Dr. Huffer's reports were produced in support of litigation, and two were produced in support of Dillon's disability claim, substantial evidence supports the ALJ's decision to consider Dr. Huffer a non-treating source.

substantial evidence.  First, her opinions are to some extent
inconsistent with Dillon's complaints and activity level.  In
2007, she diagnosed Dillon with PTSD and Legal Abuse Syndrome
and concluded that his condition is "disabling."  Tr. 241.  She
stated that Dillon is "living a life of daily terror" and
"suffers from debilitating depression and a sense of losing his
memory, even his will to live."  Id. at 250.  In contrast, the
record shows that Dillon makes household repairs and does yard
work.  Id. at 16.  He reported engaging in odd jobs, "projects,"
landscaping, and carpentry.  Id. at 22.  He takes care of a pet
cat and manages checking and savings accounts.  Id.  He is able
to care for his personal affairs, including shopping, cooking,
and attending to grooming and hygiene.  He stated that he has
"no real desire to interact with others," suggesting that he
prefers social isolation, and his mental health impairments are
not the cause of his lack of friends.  Id.  Dr. Huffer also
stated in 2010 that Dillon's ability to interact with the
public, supervisors, and co-workers is markedly impaired.  Id.
at 323.  His testimony that he interacts with homeowners,
members of the media, and lawyers, and manages a foreclosure
defense website contradicts those findings.  Id. at 16-17.

Dr. Huffer's opinions also contradict other medical
evidence in the record.  Dillon's mental health impairments have
essentially gone untreated, with the exception of the counseling

22

and medication he received from Bedford Counseling Associates and The Manchester Center for Mental Health.  Id. at 21.  Those counseling sessions focused on Dillon's legal, financial, and employment problems.  Id.  Throughout his treatment, he engaged in odd jobs to earn income, suggesting he was able to work.  Id. Additionally, various treatment notes from 2004 and 2005 state that Dillon was future-oriented, alert, pleasant, and coherent. Id. at 22.  He reported his condition as "improved" in June 2005, and in August 2005 he said that he was coming out of his depression and would likely need only two more months of counseling.  Id.  The ALJ reasonably concluded that Dillon's failure to seek further treatment or continue taking medication suggests that his symptoms are not disabling.  Id. at 21.

In addition, Dr. Huffer's conclusions conflict with Dr. Gustavson's assessment of Dillon's mental health impairments, which she based on her examination of him and review of treatment notes from his counseling sessions.  Dr. Gustavson found that Dillon is able to understand and remember instructions and tolerate common work environment stresses, including making decisions, maintaining attendance and schedule, and interacting with supervisors.  Id. at 17.  She indicated that his fine and gross motor skills appeared intact, and his speech and language compression were normal.  She observed that he was frustrated, irritable, had poor concentration and memory

and difficulty getting along with others, id. at 22, but that his mood was bright and his attitude cooperative.  Id. at 17. She found that his thought processes were logical and directed, thought content was normal, and his judgment and insight were intact.  Id.  The ALJ reasonably gave Dr. Huffer's opinions limited weight because they conflicted with Dillon's own testimony, his activity level, and other medical evidence in the record.

Dr. Huffer's conclusions also conflict with her own descriptions of Dillon's abilities and appearance.  The record does not include any treatment notes from Dr. Huffer, but her 2007 and 2009 reports provide details about her observations of Dillon.  She stated that he "is well oriented regarding time, place, and person.  He dresses appropriately and presents himself as a quiet person but with clarity and cooperation. . . . He displays at least an average level of intelligence. . . . Mr. Dillon is strong with tangible, factual matters."  Id. at 254.  She also indicated that he has "basic independence" and is capable of doing simple chores.  Id. at 249.  These observations do not comport with her conclusion that he is living a life of terror, suffering from debilitating depression, and losing his will to live.  Id. at 250.

Dr. Huffer also failed to support her opinions with medical testing or records or even specific details of the basis of her

findings.  The perfunctory nature of her opinions supports
giving Dr. Huffer's opinions limited weight.  In contrast, Dr.
Gustavson supported her conclusion that Dillon was only mildly
impaired with objective medical evidence, including the Folstein
Mini Mental Status Exam.  Id. at 292.  Dr. Huffer did not
describe any specific medical signs or laboratory findings that
support her 2010 conclusion that Dillon is markedly limited in
his mental functioning.  Id. at 24.  Because she failed to
provide objective, clinical support for her conclusions, the ALJ
properly found that Dr. Huffer's opinions merit less weight than
Dr. Gustavson's opinion.

     The frequency of examination and nature and extent of the
treatment relationship between Dr. Huffer and Dillon also
support giving Dr. Huffer's opinion limited weight.  The record
shows that Dr. Huffer and Dillon met in person only once in
Albany, NY, where Dr. Huffer was attending a conference.  Except
for that meeting, Dillon and Dr. Huffer communicated exclusively
by e-mail and telephone.  There is no evidence that Dr. Huffer
provided counseling or referred Dillon to a physician who could
prescribe medication.  Dillon testified that his last contact
with Dr. Huffer was six or eight months prior to the hearing,
and the purpose of that contact was to discuss litigation
relating to a car accident in 2006, not his mental health or
even his social security case generally.  In fact, the record

lacks any description of the substance of Dillon's discussions
with Dr. Huffer.  Dr. Huffer provided no explanation of
diagnostic tests or examinations she conducted of Dillon.
Considering the limited nature and extent of Dillon's
relationship with Dr. Huffer, the ALJ reasonably declined to
give Dr. Huffer's opinions substantial weight.

It is the ALJ's prerogative, not that of the court's, to
weigh the evidence before him.  Libby, 473 F. App'x at 8, 9.
"We must uphold the Secretary's findings ... if a reasonable
mind, reviewing the evidence in the record as a whole, could
accept it as adequate to support his conclusion." Rodriguez, 647
F.2d at 222.  Where, as here, the ALJ has supported his findings
with substantial record evidence, I defer to the ALJ's
determination. Wenzel v. Astrue, Civil No. 11-cv-269, 2012 WL
2679456, at *6 (July 6, 2012) (citing Frustaglia, 829 F.2d at
195).

**B.   Lack of access to Huffer's 2010 report**

Dillon next argues that the ALJ should not have relied on
the opinions of Drs. Gustavson and Schneider because they were
unaware of the "specialized treatment" that Dr. Huffer provided
him.  Pl.'s Br. (Doc. No. 8) at 10.  Presumably, Dillon is
referring only to Dr. Huffer's 2010 report, since both Drs.
Gustavson and Schneider referenced Dr. Huffer's 2007 and 2009
reports in assessing Dillon's mental health.  Tr. 292, 307.  An

ALJ can give significant weight to a consulting physician's
opinion, even if the consulting physician lacks access to some
available medical evidence.  Berrios Lopez v. Sec'y of Health &
Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (affirming the
ALJ's denial of benefits, which was based on the reports of two
non-examining physicians who had access to "most, although not
all, of the medical evidence").  Here, Dr. Gustavson personally
examined Dillon and reviewed all of the additional evidence
available at the time of the exam.  In fact, both Drs. Gustavson
and Schneider explicitly took note of Dr. Huffer's 2009 report,
to which her 2007 report was appended, in their own reports.
Tr. 292, 307.  Although Dr. Huffer completed a mental source
statement in 2010, subsequent to Drs. Gustavson's and
Schneider's reports, Dr. Huffer neither examined Dillon nor
provided him with treatment before completing that report.  Even
if she had, the ALJ could properly rely on the opinions of Drs.
Gustavson and Schneider.  See Berrios Lopez, 951 F.2d at 431.
Substantial evidence supports the ALJ's decision to rely on Drs.
Gustavson's and Schneider's medical opinions.[6]

---

[6] Dillon also briefly argues that the ALJ erred in finding that
he was "completely appropriate and articulate during the
hearing" because Dillon "broke down and cried when discussing
his ailments."  Pl.'s Br. (Doc. No. 8) at 8.  In fact, the only
time Dillon expressed distress was when he recounted details
relating to the onset of his mortgage foreclosure problems.  The
ALJ reasonably concluded that Dillon reacted appropriately.  An
ALJ's observations of a claimant and determinations of his

## IV.   **CONCLUSION**

For the foregoing reasons, Dillon's motion to reverse or remand the decision of the Commissioner (Doc. No. 8) is denied. The Commissioner's motion to affirm (Doc. No. 13) is granted. The clerk shall enter judgment accordingly and close the case.

SO ORDERED.


                                    /s/Paul Barbadoro
                                    Paul Barbadoro
                                    United States District Judge


October 9, 2012

cc:   John A. Wolkowski, Esq.
      Gretchen Leah Witt, AUSA

---

credibility are entitled to deference.  *Frustaglia v. Sec'y of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir. 1987). Substantial evidence exists to support the ALJ's finding that Dillon was appropriate and articulate at his hearing.